# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

JOSEPH GRANT NICOSIA,

Defendant.

No. 4:23-CR-00134

(Chief Judge Brann)

## MEMORANDUM OPINION

### AUGUST 19, 2025

## I.    BACKGROUND

On February 2, 2023, Pennsylvania State Police ("PSP") Trooper Jeremy Hoy stopped Defendant Joseph Grant Nicosia while he was traveling westbound on Interstate 80.[1] After eventually obtaining a search warrant, PSP officers searched Nicosia's vehicle and discovered approximately ten kilograms of cocaine.[2] A grand jury sitting in the Middle District of Pennsylvania subsequently returned a one count indictment against Nicosia, charging him with Possession with Intent to Distribute Cocaine in violation of Title 21, United States Code, Section 841(a)(1).[3] Nicosia then filed a Motion to Suppress Evidence on February 3, 2025, and the Court held an evidentiary hearing to address this motion on July 31, 2025.[4] That motion is now

---

[1]    PSP General Offense Report, Doc. 63-1.
[2]    *Id.*
[3]    Indictment, Doc. 1.
[4]    Motion to Suppress, Doc. 58; Hearing Sch. Ord., Doc. 64.

ripe for disposition; for the reasons that follow, Defendant's Motion to Suppress is denied.

## II.    FACTUAL BACKGROUND

### A.    Hoy's Professional Background

Trooper Hoy has served with the PSP since 2005; he initially worked in various patrol units[5] before joining the PSP's criminal interdiction team, the Central Shield Unit, in July 2013.[6] The Shield Unit has a "dual purpose[:]" (1) traffic safety and (2) "ferreting out any criminal activity on the highways or interstates in the Commonwealth."[7] As a member of the Shield Unit, Hoy's duties include "[e]ffect[ing] traffic stops" and identifying criminal activity.[8] He has received over five-hundred hours in criminal interdiction training[9] and serves as a PSP instructor for the Shield program.[10] Hoy also participates in an annual "in-service training that covers any new or amended" changes to the Pennsylvania Vehicle Code.[11]

During his time as a PSP trooper, Hoy has participated in "[s]everal hundred" drug investigations[12] and initiated approximately ten-thousand traffic stops.[13] Along Interstate 80, Hoy has recovered contraband such as controlled substances and

---

[5]    PSP Trooper Hoy CV, Hearing Ex. 6.
[6]    *Id.*; Hearing Transcript, Doc. 70 at 7:25-8:2.
[7]    *Id.* at 8:2-5.
[8]    *Id.* at 8:21-9:2.
[9]    *Id.* at 9:13-18.
[10]    *Id.* at 11:3-9; PSP Trooper Hoy CV, Ex. 6.
[11]    *Id.* at 10:4-9.
[12]    *Id.* at 11:17-24.
[13]    *Id.* at 12:8-19.

weapons and secured arrests approximately fifty to one-hundred times.[14] In any given shift, he typically observes thousands of motorists.[15]

### B.    Hoy's Observations on the Highway

On the morning of February 2, 2023, Hoy was on stationary patrol observing westbound traffic on Interstate 80.[16] Hoy "was positioned in an emergency crossover . . . at approximately mile marker 182.3"[17] in uniform in a clearly marked patrol car[18] equipped with a mobile vehicle recorder ("MVR").[19] From his position in the crossover, Hoy could "see approximately two-tenths of a mile to [his] right and approximately a half mile to six-tenths of a mile to [his] left."[20] This portion of Interstate 80 has a posted speed limit of 70 miles-per-hour ("MPH").[21] Interstate 80 is a "transcontinental roadway that spans from California to the New Jersey/New York area"[22] which connects many source cities.[23]

At approximately 8:22 a.m., a black Toyota 4-Runner traveling with the flow of traffic passed Hoy.[24] From his vantage point, Hoy could see the driver "in an

---

[14]   *Id.* at 16:15-19, 17:6-8.
[15]   *Id.* at 12:8-19.
[16]   *Id.* at 13:6-17.
[17]   *Id.* at 13:19-21.
[18]   *Id.* at 13:23-14:6.
[19]   *Id.* at 14:7-10. The MVR rewinds thirty-seconds and "record[s] from that point forward" after an officer activates the overhead lights. *Id.* at 14:16-23.
[20]   *Id.* at 18:5-7.
[21]   *Id.* at 17:17-18.
[22]   *Id.* at 15:14-15.
[23]   *Id.* at 15:22-24. A source city is "a densely-populated area with an established criminal network that can manufacture and produce or distribute narcotics from that area." *Id.* at 15:19-21.
[24]   *Id.* at 17:23-18:2, 71:19-20.

extremely rigid posture, sitting straight up, [with his] hands locked out at the 10 and 2 positions on the steering wheel . . . staring straight ahead until he passed" Hoy.[25] "When he passed in front of [Hoy's] vehicle, the Defendant looked to his right and away from" the patrol vehicle.[26]

Through his extensive experience, Hoy has become intimately familiar with the behavior of the "general innocent motoring public," allowing him to make several, pertinent observations.[27] First, he "observe[s] people on a daily basis driving in a comfortable manner . . . ."[28] Nicosia's rigid posture "was a complete 180 from what [he] generally observe[s] in those areas."[29] Second, unlike most drivers that look towards Hoy when they pass him,[30] Nicosia turned away to his right to stare at a "small open field."[31] Finally, Hoy concluded that the Toyota 4-Runner was an out-of-state rental vehicle[32] after viewing "a bar code in the windshield," a common characteristic of rental vehicles,[33] and the lack of "customization or personalization" on the vehicle.[34]

---

[25]  *Id.* at 18:11-15.
[26]  *Id.* at 18:16-17.
[27]  *Id.* at 18:23-19:5.
[28]  *Id.* at 18:23-19:1.
[29]  *Id.* at 19:3-5. But Hoy conceded he was unfamiliar with Defendant's personal driving habits. *Id.* at 73:1-12.
[30]  *Id.* at 20:20-23.
[31]  *Id.* at 20:14-15.
[32]  *Id.* at 21:12-16.
[33]  *Id.* at 21:17-22.
[34]  *Id.* at 21:23-25.

After the vehicle passed Hoy, Defendant "brake[d] three separate times," with the third time being "at least double" in duration.[35] "Nobody else applied their brakes that many times or for an extended period of time" and there was no roadway condition that warranted this extended braking.[36] But Hoy conceded that it is common for people to hit their brakes "[o]ne time" when they see a PSP vehicle.[37]

Due to this "change in driving behavior," Hoy decided to follow the vehicle;[38] when he caught up to Nicosia, Hoy witnessed Defendant "cross[] onto the solid white fog line and travel[] there for approximately two-tenths of a mile."[39] When he fully reentered the right lane, Nicosia was "at most" three car lengths behind the vehicle directly in front of him.[40] In "this stretch of the roadway," Hoy made "a right-hand turn" while Nicosia was "on the straightway traveling on the white fog line and then reenter[ing] the" right lane.[41] The road then "veers to the left," with a "slight bend in the road, so they're actually turning left in front of [Hoy] as [he was] approaching them."[42] Given this terrain, Hoy had "a good view from the side of the vehicles . . . ."[43]

---

[35] *Id.* at 23:5-10.
[36] *Id.* at 23:11-19.
[37] *Id.* at 76:7-14.
[38] *Id.* at 77:13-15.
[39] *Id.* at 24:13-18. On cross-examination, Hoy acknowledged that "in most cases, the crossing over the white line is . . . what's typically found to justify or give reasonable suspicion to a violation." *Id.* at 79:1-4.
[40] *Id.* at 24:19-21.
[41] *Id.* at 25:12-18.
[42] *Id.*
[43] *Id.*

Hoy estimated that Defendant had a following distance of "less than two seconds" at that time.[44] "Following distance is the distance between the rear of the vehicle in front of you and the front of your vehicle that you're traveling in."[45] Based on the Pennsylvania Driver's Manual, vehicles are recommended to use a "four-second following distance."[46] But certain factors may require a vehicle to increase their following distance; for example, Nicosia was traveling downhill and had a tractor-trailer approximately two-tenths-to-three-tenths of a mile in front of him.[47] These circumstances, in Hoy's view, would require a greater following distance.[48]

The PSP also recommends "one car length [of distance] for every 10 miles per hour of the speed limit for that roadway."[49] Here, that would lead to a recommendation of "approximately seven car lengths or more."[50] Again, given the downhill terrain and tractor-trailer, "it should be greater than" seven car lengths in Hoy's opinion.[51]

## C.    Hoy Initiates the Traffic Stop

On February 2, 2023, Hoy was familiar with § 3310(a) of the Pennsylvania Motor Vehicle Code, which prohibits following too closely. He noted that this

---

[44]    *Id.* at 24:24.
[45]    *Id.* at 25:21-23.
[46]    *Id.* at 25:25-26:6.
[47]    *Id.* at 86:16-17.
[48]    *Id.* at 26:7-15.
[49]    *Id.* at 26:16-20.
[50]    *Id.* at 26:21-23.
[51]    *Id.* at 26:23-27:2.

provision "states that no driver shall follow another vehicle more than reasonable or prudent for the conditions . . . being the amount of traffic in the area, the conditions of the highway, and the speed of the vehicles."[52] Due to the relevant circumstances, Hoy believed Defendant's "distance should have been more than double what it was,"[53] and therefore, was in violation of § 3310(a).

Upon reaching this conclusion, Hoy sought "a safe location to make a traffic stop."[54] As Hoy followed in the left lane, Nicosia's "vehicle slowed considerably, an overcompensation of overly cautious driving behavior."[55] This was significant to Hoy as it revealed "that he doesn't want to be stopped . . . by the police."[56] Hoy "paced [Defendant's] vehicle at 62" MPH.[57] Hoy also saw Nicosia "cross[] onto the white line two more times briefly."[58]

Hoy eventually "initiated the traffic stop at approximately mile marker 178.2 on Interstate 80 westbound."[59] This occurred "[a]pproximately four miles" after Hoy first observed the Toyota 4-Runner pass him.[60] Hoy considered this a safe location as (1) a PSP station was located near the exit and an emergency crossover was

---

[52]  *Id.* at 27:7-11.
[53]  *Id.* at 27:15-19.
[54]  *Id.* at 27:21-23.
[55]  *Id.* at 28:1-7.
[56]  *Id.* at 28:9-15.
[57]  *Id.*
[58]  *Id.* at 28:16-17.
[59]  *Id.* at 29:1-3.
[60]  *Id.* at 29:4-10.

nearby, providing easy access to any backup, and (2) the location had "no guard rail and a wide berm . . . ."[61]

After Hoy activated his overhead lights, Nicosia immediately pulled over on the right side of the road.[62] Before exiting his vehicle, Hoy narrated the basis of the traffic stop to explain "what [he] observed, what [he] saw, and what led [him] to following that vehicle and the violation."[63]

Upon exiting the patrol car, Hoy first peered into the rear window of the vehicle before approaching on the passenger side.[64] He clarified that he did so for safety reasons as the rear windows were factory tinted and could obscure a person or weapon.[65]

At the evidentiary hearing, Hoy described Defendant's demeanor as "argumentative or defensive from the start."[66] Instead of having the opportunity to introduce himself or "explain the violation[,]" Hoy "was met with, What did I do multiple times."[67] "[T]he majority of the public allows [Hoy] a chance to at least introduce [him]self and explain why . . . [he] stopped them."[68]

---

[61] *Id.* at 29:13-30:1.
[62] *Id.* at 30:11-17.
[63] *Id.* at 33:18-20.
[64] MVR Video, Doc. 63-5 at 2:25-2:39.
[65] Doc. 70 at 91:2-5. Hoy in fact testified that he "can walk up to a car and think [he has] one person, and there could be three or four in there." *Id.* at 91:12-14.
[66] *Id.* at 35:2-4.
[67] *Id.*
[68] *Id.* at 35:7-9.

Hoy then informed Nicosia that he was following the vehicle in front of him too closely, and Defendant eventually confirmed that he was driving a rental vehicle,[69] prompting Hoy to ask for the rental agreement.[70] This is a standard question to verify "who rented the vehicle and who was legally permitted to be in the vehicle."[71] Nicosia was unable to produce a hard copy of his rental agreement and explained that the rental companies no longer provide them.[72]

At this point, Hoy asks Defendant to exit his vehicle and to join him at his cruiser. He also informed Nicosia that if "everything checks out, it's probably just a warning today."[73] At the hearing, Hoy reiterated that he "was hoping to speed the process up while" Nicosia "began looking for an electronic copy of the rental agreement."[74]

But Defendant resisted exiting the Toyota 4-Runner and then, without prompting, volunteered that he was visiting a "very sick" family member.[75] After clarifying that the relative lived in Pittsburgh, Pennsylvania in response to a question from Hoy,[76] Nicosia again volunteered more information about his travel plans. He told Hoy that he was returning to see his sister in Easton, Pennsylvania and then

---

[69] *Id.* at 36:18-20.
[70] *Id.* at 37:4-5.
[71] *Id.* at 37:6-12.
[72] *Id.* at 37:13-18.
[73] Doc. 63-5 at 3:08.
[74] Doc. 70 at 37:23-38:4.
[75] Doc. 63-5 at 3:28-3:29.
[76] *Id.* at 3:30-3:33.

intended to proceed on to Binghamton, New York to visit his parents.[77] Hoy could see no luggage from his position at the front passenger window.[78]

Nicosia then explained that it made him nervous to get out of the vehicle as he had been instructed not to do so by his brother who had "went to West Point."[79] When faced with additional resistance by Defendant, Hoy again clarified that he just hoped to speed up the stop but would not force him out of the vehicle.[80] In response, Nicosia emphasized that he "hasn't done anything wrong."[81]

As he reviewed the rental agreement on Defendant's phone, Hoy asked a follow-up question related to his travel plans.[82] Nicosia replied that he intended to visit his cousin who lived "near the courtyard."[83] Defendant provided no further information other than this "vague" description and making "a hand gesture of a box."[84] At this point, Hoy identified that the rental agreement had a return date of February 1, 2023.[85] Nicosia claimed to have extended the rental,[86] but he could not

---

[77] *Id.* at 3:34-3:43.
[78] Doc. 70 at 39:11-15.
[79] Doc. 63-5 at 3:59-4:10.
[80] *Id.* at 4:20-4:30.
[81] *Id.* at 4:33-4:35.
[82] Doc. 70 at 45:10-12.
[83] Doc. 63-5 at 5:03-5:09.
[84] Doc. 70 at 45:14-25.
[85] Doc. 63-5 at 5:26-5:28.
[86] *Id.* at 5:30-5:35.

locate any proof of that extension.[87] Defendant also failed to inform Hoy of how long he extended the rental period.[88]

Hoy then repeated to Defendant that as "long as everything checks out, it's probably just a warning" before returning to his patrol vehicle.[89] On his way back to the cruiser, Hoy used his flashlight to look into the passenger side and rear windows of the Toyota 4-Runner[90] to ensure nothing in the rear of the vehicle posed a threat to him.[91] As he walked back to his vehicle, Hoy stated "boxes in the back. All the seams are taped."[92] At the evidentiary hearing, Hoy explained that he has "seen this before . . . in parcel interdiction."[93] "They tape the seams in an attempt to prevent the odor of narcotics or contraband from escaping and to avoid interdiction efforts."[94]

When he re-entered the cruiser, Hoy provided a verbal "recap[]" of the relevant events,[95] including that Nicosia refused to get out of the car and that he was "very confrontational from the start."[96] He then stated that Defendant is going to "the courtyard" in Pittsburgh and that he had "no definitive plans."[97] Hoy proceeded to

---

[87]  *Id.* at 6:19-6:21.
[88]  Doc. 70 at 46:13-17.
[89]  Doc. 63-5 at 6:23-6:25.
[90]  *Id.* at 6:30-6:38.
[91]  Doc. 70 at 53:6-12.
[92]  Doc. 63-5 at 6:42-6:44.
[93]  Doc. 70 at 54:3-7.
[94]  *Id.*
[95]  *Id.* at 55:9-12.
[96]  Doc. 63-5 at 6:54-6:55.
[97]  *Id.* at 7:10-7:12.

explain how Nicosia "flew in on Monday, [and] the vehicle was supposed to be returned yesterday."[98]

Simultaneously, Hoy began to work on the warning for following too closely, which bears an issuance time of 8:31 a.m. on February 2, 2023.[99] Hoy also attempted to contact the dispatcher to request backup, but he received no response.[100] He repeated this attempt three more times, again without any response.[101] Hoy testified that he "believed when [he] left [Defendant's] vehicle that [he] had reasonable suspicion to believe that he was involved in criminal activity."[102] This was the first point where Hoy deviated from his routine tasks in a traffic stop.[103] During this time, Hoy also ran a criminal history check;[104] through that, he learned that Nicosia "had past charges for cultivation of marijuana . . . and a weapons charge."[105]

Hoy then reapproached the Toyota 4-Runner several minutes later,[106] and he requested Nicosia to exit his vehicle.[107] This initially prompted Defendant to argue with Hoy before he complied.[108] Once Defendant joined Hoy on the side of the highway, Hoy told him that he "sees a lot of things up here on the Interstate with

---

[98]  *Id.* at 7:55-7:57.
[99]  At the hearing, Hoy testified that the warning "was initiated at 8:31 a.m." Doc. 70 at 57:10-11.
[100] Doc. 63-5 at 9:51; Doc. 70 at 55:2-4.
[101] *Id.* at 11:05, 11:45, 12:47.
[102] Doc. 70 at 57:24-58:1.
[103] *Id.* at 58:4-6.
[104] *Id.* at 58:22-23.
[105] *Id.*at 59:1-2.
[106] Doc. 63-5 at 21:28.
[107] *Id.* at 21:44.
[108] *Id.* at 21:44-22:01, 22:11.

people . . . using their vehicles to do all kinds of things."[109] He got "straight to the point" and asked if Nicosia had anything illegal in the Toyota 4-Runner, proceeding to ask him about heroin, cocaine, methamphetamine, marijuana, and large amounts of U.S. currency.[110] Hoy noted that "[t]here was a pause and change in demeanor after the methamphetamine" question.[111] Nicosia denied any wrongdoing but refused to allow Hoy to search his vehicle.[112]

Defendant then stated he wanted to contact a lawyer.[113] When he did so, he interrupted Hoy, who appeared to be indicating that he was going to contact a canine unit.[114] Hoy then informed Defendant that he believed he was involved in criminal activity, and he performed a pat down of Nicosia.[115] Offscreen, Hoy is heard stating that he will "call a dog," presumably to the second PSP trooper, Trooper Webb, that had just arrived.[116] Hoy and Webb then informed Defendant that his vehicle was detained.[117]

Hoy proceeded to reenter his cruiser while Webb remained with Nicosia.[118] He did so to contact Corporal Mark Conrad, a PSP K-9 drug detection handler.[119]

---

[109] *Id.* at 22:16-22:23.
[110] *Id.* at 22:24-22:44.
[111] Doc. 70 at 60:1-2.
[112] Doc. 63-5 at 22:44-22:47.
[113] *Id.* at 22:50-23:07.
[114] *Id.* at 23:02-23:04.
[115] *Id.* at 23:12-23:35.
[116] *Id.* at 23:51-23:58.
[117] *Id.* at 24:04.
[118] Doc. 70 at 60:18-21.
[119] *Id.* Conrad was the only K-9 officer that could have responded that day. *Id.* at 122:3-5.

Hoy eventually left his vehicle to inform Defendant that the canine unit was thirty-minutes away, and Defendant began to argue with him, repeatedly asking why he is doing this and insisting that he did not commit a traffic violation.[120] After this conversation, Hoy re-entered the cruiser.[121]

Sometime later, Hoy again exited his vehicle and approached Nicosia.[122] Defendant apologized for giving the officers a hard time after inquiring into why he could not contact an attorney.[123] Nicosia then accused Hoy of "already ma[king] [his] decision," seemingly implying that Hoy already viewed him as guilty.[124] The next several minutes were spent with small talk being made amongst Nicosia and the PSP troopers[125] before Hoy informed Defendant that the canine unit was approximately ten minutes away.[126] He also inquired into what is in the shoeboxes in the trunk of his vehicle.[127] Nicosia claimed they held hard drives and tax papers from a storage unit he had cleared out.[128] At Hoy's prompting, Defendant confirmed that everything in the vehicle belonged to him.[129]

---

[120] Doc. 63-5 at 28:22-30:40.
[121] *Id.* at 31:39.
[122] *Id.* at 38:02.
[123] *Id.* at 38:33.
[124] *Id.* at 39:00.
[125] *Id.* at 41:20-43:50.
[126] *Id.* at 49:38.
[127] *Id.*
[128] *Id.* at 49:45-50.
[129] *Id.* at 49:59-50:03.

Hoy noted at the hearing that "this is the first [time] that he mentioned anything about clearing out a storage unit, but it also confirmed that he had knowledge of those boxes in the back of the vehicle."[130]

Once the canine unit arrived, Conrad deployed K-9 Don, a drug detection dog.[131] Conrad had undergone an initial, twelve-week long K-9 training and certification with Don.[132] Since his initial certification in May 2022, the K-9 has undergone "[s]everal hundred" hours of additional training.[133]

The drug dog began its sweep of the vehicle, which lasted for approximately ninety seconds.[134] Don is certified to detect marijuana, cocaine, heroin, and methamphetamine.[135] The "search consists of a systematic and reverse systematic pattern around a search area" with the handler "presenting productive areas for the dog to put his nose to inhale the air there."[136] As the dog performed the search, Conrad watched for "alert behavior or indication behavior."[137] The alert behavior is "an excited behavior" that is "the change of body posture during the search" and

---

[130] Doc. 70 at 62:8-12.

[131] *Id.* at 62:18-19.

[132] *Id.* at 117:15-16.

[133] *Id.* at 118:2-6.

[134] Doc. 63-5 at 56:19-57:42.

[135] Doc. 70 at 118:14-15.

[136] *Id.* at 118:23-119:1.

[137] *Id.* at 119:1-2. An alert behavior is a "change in body posture that [Conrad] recognize[s] through training with him and through certification." *Id.* at 126:9-16. The indicate behavior "[t]ypically" only arises when the dog "can get to the source of the drugs. . . ." *Id.*

"[o]ften" an "increased tail wagging" or "a break from the search pattern to try to find the source of the trained odor."[138]

Conrad "began at the front of the vehicle" and "deployed Don on a search around the vehicle, up along the driver's side."[139] In doing so, he "present[ed] the dog's nose on those productive areas" that "are more likely for odor . . . to be escaping the inside of the vehicle to the outside."[140] On the second trip around the vehicle, he "noticed the alert behavior from Don."[141] After Conrad presented the wheel well on the rear driver's side, Don "br[oke] from the search pattern" and began "trying to follow the narcotic odor to its source."[142] Don's respiration increased; he increased his tail wagging, and he broke from the search pattern.[143] Conrad noticed "similar alert behavior" at the rear of the vehicle.[144] This behavior indicated that Don was "detecting one of the odors that he's trained to detect."[145] Conrad relayed this information to Hoy.[146]

---

[138] *Id.* at 119:5-9.
[139] *Id.* at 122:14-17.
[140] *Id.* at 123:19-24.
[141] *Id.*
[142] *Id.* at 123:6-13, 124:3-14.
[143] *Id.* at 124:3-14. Conrad described this break in the search pattern as Don "not paying attention to the areas [he is] pointing at as much" and it is more of him "working on his own, trying to get to the source of those odors." *Id.* at 129:1-4.
[144] *Id.*
[145] *Id.* at 124:16-17.
[146] *Id.* at 124:20-21.

Hoy then informed Nicosia that the dog had alerted, and he again asked for permission to search the vehicle.[147] Defendant proceeded to argue with the PSP troopers, with Hoy eventually concluding that it was a refusal.[148] Shortly thereafter, Nicosia was detained and transported to a PSP location.[149] Upon their arrival at the barracks, the PSP "did another exterior walk around the vehicle" and "through the rear window" the officers saw "the one shoe box had a small clear hole on the top of it."[150] While shining a flashlight at it, "you could see a vacuum sealed packaged contained within it."[151] Hoy "believed it to be contraband."[152]

A search warrant was eventually obtained to search the rental vehicle,[153] and the two shoe boxes were discovered to "contain[] 10 individual packages of vacuum-sealed" cocaine, each weighing approximately one kilogram.[154]

## III.    ANALYSIS

Defendant has raised two challenges in his Motion to Suppress. First, he asserts that Hoy lacked reasonable suspicion to initiate the traffic stop. Second, even if the stop was properly commenced, Hoy improperly extended it. Neither warrants suppression.

---

[147] Doc. 63-5 at 58:30-59:04.
[148] *Id.* at 59:04-1:01:06.
[149] *Id.* at 1:02:57.
[150] Doc. 70 at 64:21-65:1.
[151] *Id.* at 65:1-2.
[152] *Id.* at 65:6.
[153] *Id.* at 65:7-13.
[154] *Id.* at 66:10-14.

**A.      The Initial Traffic Stop was Supported by Reasonable Suspicion**

Section 3310(a) of the Pennsylvania Motor Vehicle Code provides that "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway."

As Trooper Hoy noted, the PSP Trooper's Manual suggests that motorists should allow one-car lengths worth of distance for every 10 miles per hour of the speed limit while the Pennsylvania Driver's Manual suggests allowing for a four second following distance.[155] Nicosia drove closer than either of these suggestions at a maximum distance of three car lengths.

Courts analyzing this portion of the Pennsylvania Motor Vehicle Code in the United States Court of Appeals for the Third Circuit have consistently held that following at distances of only one-to-two car lengths violates § 3310(a).[156] This has especially been the case when the operator is closely following a tractor-trailer or other large, commercial vehicle.[157] Pennsylvania courts applying this statute have reached similar conclusions.[158]

---

[155] Doc. 70 at 25:25-26:6, 26:16-20. *See also United States v. Romero*, 559 F. Supp. 3d 437, 445 (W.D. Pa. 2021).

[156] *E.g.*, *United States v. Romero*, 559 F. Supp. 3d 437 (W.D. Pa. 2021); *United States v. Ponder*, 4:16-CR-0056, 2017 WL 2436370 (M.D. Pa. June 9, 2017) (Brann, J.); *United States v. Chance*, No. 22-3191, 2024 WL 1110383 (3d Cir. Mar. 14, 2024).

[157] *E.g.*, *United States v. Gonzalez-Seovia*, No. 5:18-cr-00558, 2019 WL 353910 (E.D. Pa. Aug. 2, 2019).

[158] *E.g.*, *Commonwealth v. Phinn*, 761 A.2d 176 (Pa. Super. Ct. 2000); *Commonwealth v. Purnell-Jones*, NO. 1946 MDA 2013, 2014 WL 10915532 (Pa. Super. Ct. July 23, 2014).

Here, Defendant's distance is, at most, slightly greater than that seen in the relevant caselaw. Given the presence of the tractor-trailer and the downhill slope of Interstate 80 at this location, the relevant circumstances suggest Hoy observed a violation of § 3310(a). But the Court need not definitively decide this; "an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, only produce facts establishing that she reasonably believed that a violation had taken place."[159] That is precisely what occurred here. As such, Hoy properly initiated the traffic stop, and this provides no basis for suppression.

### B.    Hoy Did Not Improperly Extend the Traffic Stop

Defendant's second argument is that Hoy improperly extended the length of the traffic stop. "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' – to address the traffic violation that warranted the stop."[160] "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.'"[161] "Authority for the seizure thus ends when tasks tied to the traffic infraction are–or reasonably should have been–completed."[162]

An officer therefore "may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the

---

[159] *United States v. Delfin-Colina*, 464 F.3d 392, 398 (3d Cir. 2006).
[160] *Rodriguez v. United States*, 575 U.S. 348, 354, 135 S.Ct. 1609, 1614, 191 L.Ed. 2d 492 (2015).
[161] *Id.*
[162] *Id.*

stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."[163] "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'"[164] "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."[165] The Third Circuit has also "held that some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop, as do delays caused by safety concerns related to the stop."[166]

Courts have dubbed an impermissible extension of a traffic stop as the "*Rodriguez* moment."[167] The Third Circuit has previously "err[ed] on the side of caution and assume[d] the earlie[st]" of the possible *Rodriguez* moments when completing its analysis.[168] In *United States v. Green*, the Third Circuit explained that "when evaluating reasonable suspicion[,] a court's task is to assess the situation as a whole."[169] To perform this analysis, the Court is to only consider the facts known to the officer at that moment.[170]

---

[163] *Id.* at 355.
[164] *Id.*
[165] *Id.*
[166] *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020).
[167] *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018).
[168] *Id.*
[169] *Id.* 184-185.
[170] *Id.*

Defendant identified five purported *Rodriguez* moments: (1) when Hoy requested Nicosia exit his vehicle at the beginning of the traffic stop; (2) when Hoy informed Defendant that he was checking to make sure everything was okay; (3) when Hoy first returned to his patrol vehicle; (4) when Hoy ordered Defendant out of his vehicle; and (5) when Hoy informed Nicosia that he intended to call for a canine unit.

It is impossible for the first two moments identified to be the relevant point in time for the Court's analysis. At both moments, Hoy had not completed the requisite tasks of the traffic stop. Nor can it be said he improperly delayed his completion of these tasks. Much of the delay in fact occurred due to Defendant's own, unsolicited volunteering of information concerning his travel plans.

Instead, the Court views Defendant's third identified *Rodriguez* moment as the proper point for its analysis. Upon reentering the patrol vehicle, Hoy eventually deviated from the tasks associated with the traffic stop to request backup, thereby extending the traffic stop into an investigative detention.

Under the totality of the circumstances, Hoy testified that he believed Defendant was engaged in criminal activity at that point.[171] During the evidentiary hearing, Hoy highlighted the following information known to him at that time to support that belief: (1) Defendant drove an expired rental vehicle; (2) his "overly

---

[171]  Doc. 70 at 48:5-7.

cautious driving behavior" and rigid posture; (3) "the confrontational or defensive manner in how" Defendant immediately spoke to Hoy; (4) his refusal to exit his vehicle; (5) his travel plans encompassed several source cities and Defendant was traveling along a known drug corridor; and (6) Nicosia volunteered extensive travel plans.[172] I discuss each of these separately below but emphasize that my analysis concerns the totality of the circumstances.

### 1. Nicosia's Behavior

Nicosia's behavior before and during the traffic stop raised suspicion. Hoy observed Defendant operating his vehicle in an "extremely rigid posture holding the steering wheel at the 10 and 2 positions" and he turned his head away from Hoy as he passed by.[173] He also applied his breaks three separate times after passing Hoy's cruiser.[174] As Hoy explained, these actions are suggestive of overly cautious behavior. While this alone is insufficient, behavior different from that of the general motoring public properly enters the reasonable suspicion calculus.

During the traffic stop, Defendant's behavior further raised concerns. He was confrontational and defensive from the moment the stop began.[175] He also resisted exiting his vehicle, something Hoy explained coincides with commonly given

---

[172] *Id.* at 48:10-50:4.
[173] *Id.* at 18:11-15.
[174] *Id.* at 23:5-10.
[175] *Id.* at 35:2-4.

instructions to drug traffickers.[176] Altogether, Defendant's behavior moderately supported the development of reasonable suspicion.

### 2.    Interstate 80

The Court should also consider the location Defendant was traveling. Hoy knew Interstate 80 is a drug trafficking corridor, something the Third Circuit has recognized as a relevant consideration in the reasonable suspicion analysis.[177] Further, Hoy recognized that Defendant had included several source cities in his purported travel plans.

### 3.    The Expired Rental Vehicle

Defendant's use of a rental vehicle was significant to Hoy for several reasons. Rentals are commonly used by criminal organizations as the vehicles are ordinarily newer, and therefore more reliable,[178] and provide for a greater degree of anonymity. With no personalization, "they blend in with traffic . . . ."[179] Further, the license plate is connected to the rental company, not the driver.[180] For example, running the Toyota 4-Runner's plate did not inform Hoy that Nicosia "was from California, that

---

[176] *Id.* at 41:12-17.

[177] *United States v. Stewart*, 92 F.4th 461, 470 (3d Cir. 2024) ("Stewart's travel on I-80, which Tessitore knew to be a drug trafficking corridor, was also a factor contributing to reasonable suspicion.").

[178] Doc. 70 at 22:6-15.

[179] *Id.*

[180] *Id.* at 22:16-19.

he flew to New Jersey and was driving to Pittsburgh."[181] Finally, using a rental vehicle frees the criminal from any risk of seizure of their personal vehicles.[182]

The expired rental agreement held additional significance for Hoy. Through his training and experience, he had come to learn that drug trafficking plans "are very unpredictable" and they "can change at the last second."[183] Hoy has assisted undercover units with intercepting traffickers, and he observed that "[t]here's often delays or [the PSP] may even have to cancel because it doesn't go on the day that [they] thought it was going to go."[184] An overdue rental car therefore properly contributes to reasonable suspicion.[185]

### 4.    Defendant's Travel Plans

Based on his "training and experience," Hoy viewed an individual that shares "their entire itinerary without being asked that includes multiple stops but very little detail on what he's actually doing" as "a rehearsed cover story."[186] "[T]heir goal is to get it out as soon as possible because they're rehearsing it and trying to remember what . . . they've rehearsed."[187] Hoy also viewed "[t]he mention of sick relatives [a]s a ploy to have the officer sympathize with . . . the person to . . ." avoid having the

---

[181] *Id.*

[182] *Id.* at 22:20-24.

[183] *Id.* at 46:22-24.

[184] *Id.* at 46:25-47:5.

[185] *E.g.*, *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020). *See also United States v. Winters*, 782 F.3d 289, 300 (6th Cir. 2014).

[186] Doc. 70 at 40:12-22.

[187] *Id.*

officer "dig in to [the] story."[188] The same is true regarding Defendant's elderly parents and the military service of his brother.[189] He had "long distance[s]" and "many hours of travel in a short amount of time with very vague reasons for the travel."[190] Surprisingly, he also seemingly had no luggage in the vehicle despite having extensive travel plans.[191] Most critically, Hoy observed several tightly packaged boxes in the Toyota 4-Runner.[192] Hoy knew these boxes were similarly packaged to narcotics packages.

### 5.    The Totality of the Circumstances

Under the totality of the circumstances, Hoy had reasonable suspicion to extend the traffic stop. Defendant displayed a number of indicators, when viewed together, that provided ample reasons for an officer to reasonably suspect he was engaged in criminal activity. His overly cautious and eventually defensive behavior raised an initial flag. Hoy's suspicions were then confirmed by Defendant's unrealistic travel plans in a seemingly expired rental vehicle along a known drug corridor with packages packaged similarly to narcotics packages.

---

[188] *Id.* at 40:25-41:2.
[189] *Id.* at 41:6-10.
[190] *Id.* at 47:24-25.
[191] Doc. 70 at 39:11-15.
[192] *Id.* at 54:3-7.

## IV.    CONCLUSION

As a result, Trooper Hoy had reasonable suspicion to both initiate the traffic stop and extend it. Nicosia's arguments to the contrary are unavailing, and his motion is therefore denied.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge